IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| SHELLY MARASI, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:21-cv-00011 |
| | ) | |
| v. | ) | Chief Judge Crenshaw |
| | ) | Magistrate Judge Newbern |
| TENNESSEE TECH UNIVERSITY, | ) | |
| THOMAS TIMMERMAN, in his | ) | Jury Demand |
| official capacity, FRANK STUART | ) | |
| WELLS, in his official capacity, and | ) | |
| PHILIP OLDHAM, in his official | ) | |
| capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

Pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), Plaintiff, Dr. Shelly Marasi ("Dr. Marasi"), files this First Amended Complaint against Defendants Tennessee Tech University ("TTU"), Dr. Thomas Timmerman, in his official capacity ("Dr. Timmerman"), Dr. Frank Stuart Wells, in his official capacity ("Dr. Wells"), and Dr. Philip Oldham, in his official capacity ("Dr. Oldham") (collectively "Defendants"), and states:

### PARTIES

1. Dr. Marasi is a citizen and resident of Covington, Louisiana, and Cookeville, Tennessee, and an Assistant Professor in the Department of Decision Sciences and Management in the College of Business at TTU.

2. TTU is a state-operated educational institution offering educational programs and activities with its principal place of business in Cookeville, Tennessee. TTU receives federal funding and financial assistance. TTU employs more than 1,000 individuals.

3. Dr. Timmerman is the Department Chair for Decision Sciences and Management in the College of Business at TTU and Dr. Marasi's immediate supervisor who made and approved the decision not to retain Dr. Marasi in her tenure track faculty position and to terminate her employment and participation in educational programs and activities at TTU. He has the power and authority to recommend that she be retained in or reinstated to her or an equivalent position at TTU.

4. Dr. Wells is a tenured Professor in the Department of Decision Sciences and Management in the College of Business at TTU who substantially influenced the decision not to retain Dr. Marasi in her tenure track faculty position and to terminate her employment at TTU. He has the power and authority to recommend that she be retained in or reinstated to her or an equivalent position at TTU.

5. Dr. Oldham is TTU's President who has the power or authority to retain or reinstate and/or to recommend the retention or reinstatement of Dr. Marasi to her or an equivalent position at TTU.

## JURISDICTION AND VENUE

6. Dr. Marasi brings this action for declaratory relief, prospective injunctive relief, equitable relief, and damages for unlawful employment practices under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*. ("Title IX"), Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. ("Title VII"), the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq*. ("RA"), and the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101, *et seq*. ("ADA"). The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(4). Venue is proper under 28 U.S.C. § 1391.

7. Dr. Marasi has met all conditions precedent to the filing of this First Amended Complaint. With respect to her Title VII and ADA claims, she timely filed a Charge of Discrimination against TTU with the U.S. Equal Employment Opportunity Commission ("EEOC") on July 29, 2020. The EEOC through the U.S. Department of Justice sent Dr. Marasi two Notices of Right to Sue, one for her Title VII claims and one for her ADA claims, on April 12, 2021, which she filed with the Court on April 16, 2021. (Docs. 11-1, 11-2).

## FACTS

8. Dr. Marasi has worked for TTU as a Tenure Track Assistant Professor in the Department of Decision Sciences and Management in the College of Business since August 1, 2016.

9. Dr. Marasi is qualified for her job and has performed her job duties in an exemplary manner. She demonstrated excellent performance in (a) teaching, (b) research/scholarship/creative activity, and (c) service/outreach, among other areas.

10. In addition to teaching business courses to college students, Dr. Marasi has always been heavily involved in various educational programs and activities at TTU. For example, she served as the faculty advisor for the Society for Human Resource Management ("SHRM") student organization at TTU. In this role, she regularly traveled to conferences and competitions with groups of TTU students. Further, to maintain her certification as a Senior Professional in Human Resources ("SPHR"), Dr. Marasi was required to periodically earn educational credit hours in various categories, such as "Professional Achievement," "Research and Publishing," and "Instruction," and to attend educational conferences. Dr. Marasi was also responsible for conducting and supervising research outside of the classroom, preparing many articles for publication and having them published in educational journals, continuously serving

3
Case 2:21-cv-00011 Document 14 Filed 04/29/21 Page 3 of 17 PageID #: 61

as a faculty advisor to many TTU students, mentoring approximately 50 per semester until Defendants retaliated against her and reduced that number to approximately 5, and maintaining and keeping track of various educational and related certifications for herself and others. Thus, Dr. Marasi has been directly and continuously involved in many educational programs and activities, among other responsibilities, throughout her employment at TTU. As further shown below, the discrimination, harassment, and retaliation alleged in this complaint has adversely impacted her ability to continue participating in these programs and activities. Dr. Marasi has been excluded from participation in, denied the benefits of, and subjected to discrimination in the foregoing and related educational programs and activities that she has been involved in throughout her employment at TTU.

11. Before March 2020, Dr. Marasi received excellent performance evaluations and unanimous position "retention" votes from the department retention committee except for on one occasion in October 2017. In April 2018, she won the "Excellence in Overall Performance" award from the College of Business and the "Best Research Paper of 2018" award from a journal. She later won the "Scholastic Research Award" for 2019 from TTU and was nominated for the "Best Teaching and Learning Paper of 2019" from a journal.

12. Beginning in the fall of 2019, Dr. Marasi was subjected to sex-based discrimination and harassment by three adult male students enrolled in the TTU College of Business, twin brothers M.M. and M.M., and W.W., and by a male tenured Professor in the College, Dr. Wells.

13. M.M. and M.M. made unwelcome sexual advances toward Dr. Marasi, which she rejected. They further falsely and repeatedly told other students and employees that she was

4

romantically "interested in" them, that she tried to have sex with them, and that she was going to get fired for trying to have sex with them.

14. W.W. sexually harassed Dr. Marasi by stating to her in public in front of other students, "How many people have you slept with? Can I be one?"

15. Dr. Marasi rebuffed W.W.'s sexual advances and told him to get away from her. W.W. got angry, threatened her employment, stated that he knew the Dean of the College, Thomas Payne, and that he was going to make false statements about her and get her fired. W.W. then took unauthorized photographs of Dr. Marasi without her permission or consent.

16. W.W. later approached Dr. Marasi again and indicated that he was going to make false statements about her to TTU and get her fired.

17. W.W. distributed the unauthorized photographs he took of Dr. Marasi to Dr. Wells, among others. Wells communicated with M.M. and M.M., W.W., and others about Dr. Marasi and the photographs. Wells and W.W. showed, distributed, and caused the photographs and false, sex-based accusations and information about Dr. Marsasi to be further distributed and disseminated to other faculty and students at TTU.

18. Dr. Wells harassed and humiliated Dr. Marasi and subjected her to a hostile, intimidating, and abusive work environment by making false, sex-based statements about her allegedly trying to have sex with students and engaging in inappropriate conduct of a sexual nature. Wells made these statements to Dr. Marasi, other faculty, and students, among others. Wells further consistently commented on Dr. Marasi's appearance, which made her very uncomfortable.

19. Dr. Wells made significant efforts to undermine and sabotage Dr. Marasi's reputation and the excellent work she had done at TTU. His conduct exacerbated and

5

compounded that of M.M. and M.M. and W.W. The combination of their discriminatory and harassing conduct adversely affected Dr. Marasi's work environment and well-being.

20. Multiple individuals approached Dr. Marasi and mentioned the false sexual statements that M.M. and M.M., W.W., and Dr. Wells had communicated about her, including that she was "going to be fired" for allegedly trying to have sex with students.

21. M.M. and M.M.'s, W.W.'s, and Dr. Wells' sex-based discriminatory conduct and statements to and about Dr. Marasi were severe or pervasive, unwelcome and offensive, humiliating and degrading, and created a work environment that a reasonable female professor in her position would find intimidating, hostile, or abusive. It adversely affected and altered the conditions of Dr. Marasi's employment and participation in educational programs and activities, had adverse psychological and physical effects on her, and interfered with and made it more difficult for her to perform her job and to participate and perform her roles in the educational programs and activities described in paragraph 10 above.

22. Dr. Marasi was forced to continue enduring the sex-based hostile work environment from the fall of 2019 until TTU moved its courses online in mid-March 2020 due to the COVID-19 pandemic.

23. Dr. Marasi repeatedly reported M.M. and M.M.'s, W.W.'s, and Dr. Wells' conduct to her supervisor and Department Chair, Dr. Timmerman, and to TTU's Title IX Office, Human Resources Department, and Student Affairs Department, among other TTU officials.

24. Dr. Marasi expressly requested that Dr. Timmerman assist her with her above reported concerns on October 21, 2019, and on November 22, 2019.

25. Dr. Timmerman refused to assist Dr. Marasi and, on more than one occasion, asked her if "the sexual rumors about [her] [were] true." Dr. Marasi told him that they were completely false.

26. When alleged rumors about a male faculty member in the Department allegedly having sexual relations with students came to his attention, Dr. Timmerman never questioned him about the matter, twice offered him retention in his tenure track faculty position, and did not exclude him from participation in educational programs and activities at TTU.

27. As a supervisor, Dr. Timmerman was obligated to report the conduct Dr. Marasi complained of, even if only "suspected" or "alleged" conduct, to TTU Human Resources, its Title IX Office, and/or Student Affairs. He failed and refused to do so.

28. Instead, Dr. Timmerman affirmatively dissuaded and discouraged Dr. Marasi from making a Human Resources, Title IX, or other similar complaint to TTU.

29. Dr. Marasi ultimately had no choice but to repeatedly report the sex discrimination, harassment, and retaliation she experienced to TTU via channels other than Dr. Timmerman. On November 25, 2019, she reported it to TTU's Title IX Coordinator, who advised her that she needed to contact Human Resources instead.

30. Dr. Marasi then reported the sex discrimination, harassment, and retaliation she experienced to HR from November 26, 2019, through December 6, 2019, and in January 2020. She later reported it to Student Affairs and Dean of Students Katherine Williams, as well.

31. TTU Human Resources communicated with Dr. Timmerman and Dr. Wells and informed them of Dr. Marasi's complaints to it in late November and/or early December 2019.

32. On or about December 3, 2019, Dr. Marasi observed M.M. and M.M. go into Dr. Wells' office and then saw the three of them go into Dr. Timmerman's office together.

33. In early December 2019, HR advised Dr. Marasi that Dr. Timmerman, Dr. Wells, and M.M. and M.M. had discussed the false sexual statements that had been communicated to others about her. HR further advised Dr. Marasi that M.M. and M.M. claimed that they "did not know" about the false sexual statements that they had communicated to others about her "until" Dr. Timmerman and Dr. Wells told them about them.

34. Defendants retaliated against Dr. Marasi for opposing and reporting the sex-based discrimination, harassment, and retaliation she had experienced.

35. Dr. Timmerman's disposition and demeanor toward Dr. Marasi changed significantly and for the worse after he learned that she had reported her concerns to HR against his advice that she not report them.

36. On or about December 4, 2019, Dr. Timmerman scolded Dr. Marasi and expressed anger toward her for making her complaints to Human Resources. This was intimidating and threatening to Dr. Marasi.

37. All of the conduct described above caused Dr. Marasi to suffer severe and extreme anxiety.

38. Dr. Marasi is an individual with a disability within the meaning of the RA and the ADA.

39. TTU was aware that Dr. Marasi was suffering from severe anxiety because of the discriminatory and retaliatory harassment at issue and that she was obtaining medical treatment for it because she informed HR and others of her medical condition and receipt of treatment.

40. TTU's HR representatives observed Dr. Marasi's reactions when she advised them through tears that she had lost a significant amount of weight, that her hands shook

uncontrollably, and that she suffered extreme anxiety and fear whenever she came to campus because of the discriminatory conduct at issue.

41. Dr. Marasi's impairment substantially limited her in one or more major life activities. TTU further regarded her as having an impairment. Notwithstanding her impairment, Dr. Marasi was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation.

42. Beginning in mid-December 2019 and continuing through mid-March 2020 when TTU converted all of its courses to online courses, Dr. Marasi requested from TTU and Dr. Timmerman the reasonable accommodation of being permitted to teach her courses online and provided supporting medical documentation.

43. On January 7, 2020, TTU denied Dr. Marasi's initial request for reasonable accommodation, specifically and summarily claiming that it constituted an "undue hardship." In so doing, TTU failed and refused to engage in the mandatory good-faith interactive process with Dr. Marasi designed to identify reasonable accommodations of her disability. It continued in its failure to engage in the interactive process in good faith through mid-March 2020, when TTU converted all of its courses to online courses.

44. Dr. Marasi continuously opposed TTU's disability discrimination and refusal to reasonably accommodate her and repeatedly requested that it reconsider her requests for reasonable accommodation.

45. On January 10, 2020, TTU only partially granted Dr. Marasi's request, which was insufficient to meet her medical needs. In continuously failing and refusing to fully honor her request for reasonable accommodation from mid-December 2019 through mid-March 2020,

when TTU converted all of its courses to online courses, TTU discriminated against Dr. Marasi because of a disability.

46. TTU treated Dr. Marasi differently and less favorably in the terms, conditions, and privileges of employment than similarly situated male and nondisabled employees and employees who had not complained of discrimination or requested reasonable accommodation. These employees, including but not limited to Dr. Brian Jones and Dr. Ken Wiant, were permitted to teach their courses online before the COVID-19 pandemic began in mid-March 2020.

47. Granting Dr. Marasi's requested accommodation would not have imposed any undue hardship on TTU. Indeed, TTU moved all of its courses online in mid-March 2020. Moreover, Dr. Marasi's subsequent Agreement on Responsibilities for the 2020-2021 academic year stated that she was to teach all courses online for both the fall and spring semesters. Thus, TTU cannot establish that allowing her to do so from or about January to May 2020 would have imposed any undue hardship on it. TTU failed to reasonably accommodate Dr. Marasi.

48. In or about early February 2020, TTU Human Resources found that M.M. and M.M. had "perpetrated [false sexual] rumors about [Dr. Marasi] by telling other students and TTU employees" that she had tried to have sex with them and was going to be fired for doing so.

49. HR further found that W.W. had made the highly offensive, unwelcome, sexually charged and harassing, severe and threatening statements that Dr. Marasi reported he had made.

50. Despite these findings, TTU took no corrective, remedial, or preventative action in response to Dr. Marasi's complaints to it. TTU never even spoke to W.W. about his corroborated sexual harassment of Dr. Marasi. TTU's response to Dr. Marasi's complaints demonstrated deliberate indifference to her reported concerns.

51. After Dr. Marasi complained to Human Resources about his sex-based discriminatory and harassing conduct, Defendants retaliated against her.

52. Dr. Wells had and exercised authority to assist in establishing guidelines related to academic matters such as scheduling courses, selecting teaching methods, setting grading policies, university curriculum, and graduation requirements. Wells also had significant influence in deciding whether faculty members in the department were hired and awarded retention, tenure, and promotion, among other things.

53. Dr. Wells falsely stated to Dr. Marasi that she had flirted with TTU football players and athletes; tried to have sex with students; that he had told Dr. Timmerman that she had done so; that he did not want her working at TTU any longer; that he and Dr. Timmerman were not going to vote for her retention or tenure because he believed the false statements and rumors about her; that he was going to ensure that other department faculty knew about them; and that she would not receive retention or continue working at TTU.

54. Dr. Wells improperly shared and discussed the unauthorized photographs he had obtained of Dr. Marasi with other department faculty who would soon vote on her retention as a professor. He falsely stated that she had engaged in inappropriate sexual conduct with students. He told other faculty that he was not going to vote for her retention or tenure and suggested that they do the same. He did so in an effort to retaliate against her and to persuade others to vote against her.

55. Dr. Wells further provided the photographs of Dr. Marasi to TTU Academic Affairs and made false statements about her in a retaliatory effort to have her terminated.

56. Dr. Wells further stared at Dr. Marasi on multiple occasions in a hostile and intimidating manner. His wife Susan Wells, also a faculty member, also harassed Dr. Marasi.

She falsely stated that "a faculty member in the department" had tried to have sex with male students. On February 4, 2020, Susan Wells blocked Dr. Marasi from leaving a copy room and stared at her in a malicious manner. On February 25, 2020, Dr. Wells and Susan Wells stood outside of Dr. Marasi's classroom door and maliciously stared at her through the window.

57. On March 6, 2020, Dr. Timmerman met with Dr. Marasi and gave her the first negative annual performance evaluation she had ever received at TTU. The ratings on this evaluation were far lower than all of Dr. Marasi's previous evaluations.

58. Dr. Timmerman further informed Dr. Marasi on March 6, 2020, that she had been denied retention of continued employment and stated that her employment at TTU, and consequently her participation in educational programs and activities at TTU such as those described in paragraph 10 above, would end effective May 2021. For example, Dr. Marasi was stripped of numerous student-advisees, being reduced from approximately 50 to approximately 5; directed to step down as faculty advisor to the SHRM student organization at TTU; removed from the College of Business Undergraduate Council; and removed from other educational programs and activities at TTU that she needed in order to maintain her SPHR certification. Defendants' denial of retention further resulted in Dr. Marasi being ineligible for promotion and tenure. In denying her retention and continued participation in educational programs and activities, Dr. Timmerman referred directly to Dr. Marasi's Human Resources complaint and stated that she had "escalated conflict" by making that complaint.

59. Dr. Timmerman further stated to Dr. Marasi, "Are you happy that you went and pursued the investigation route? Has that turned out to be a good experience or not a good experience for you?" Dr. Timmerman's statements to Dr. Marasi on March 6, 2020, evidenced a vindictive and retaliatory motive.

60. Dr. Timmerman had the power and authority to determine whether a faculty member such as Dr. Marasi would receive retention and/or tenure and continued employment.

61. Drs. Timmerman and Wells advocated against Dr. Marasi to other TTU faculty and substantially influenced and were the driving force behind her being denied retention in her tenure track faculty position and her employment and participation in educational programs and activities with TTU being terminated.

62. Defendants' asserted reason for not retaining, terminating, and refusing to reinstate Dr. Marasi are pretexts for discrimination and/or retaliation. Contrary to TTU's assertion, Dr. Marasi met and exceeded the applicable requirements for retention and tenure. The dossier she submitted demonstrated that she had excelled in (a) teaching, (b) research/scholarship/creative activity, and (c) service/outreach, among other areas.

63. On or about April 8, 2020, and June 4, 2020, Dr. Marasi appealed Defendants' decision not to renew her tenure track faculty appointment and to terminate her employment to TTU's Faculty Affairs Committee and Faculty Senate, respectively.

64. On or about May 4, 2020, Dr. Timmerman further retaliated against Dr. Marasi by writing a lengthy letter to the Faculty Affairs Committee advocating against her retention.

65. While they should have relied on the extensive dossier Dr. Marasi had submitted and whether she had met the requirements for retention by making progress toward tenure, the Faculty Affairs Committee and the Faculty Senate relied on false and incomplete information in Dr. Timmerman's letter and in Human Resources' investigation memoranda related to Dr. Marasi's prior complaints of discrimination and retaliation.

66. For example, Dr. Timmerman deliberately omitted from his letter his involvement in directing Dr. Marasi to use bonus points to encourage more students to participate in student

13
Case 2:21-cv-00011 Document 14 Filed 04/29/21 Page 13 of 17 PageID #: 71

evaluations, and his advising her that submitting student comments from courses was not required for retention. He did not mention that many faculty in the College of Business offered bonus points to promote participation in student evaluations. He did not state that faculty are not required to submit student comments in dossiers for retention. He only provided select negative student evaluation comments, and none of the many positive comments Dr. Marasi had received.

67. Dr. Timmerman's retaliatory acts and omissions ensured that Dr. Marasi would not receive a fair and impartial appeal of the decision to terminate her employment. As a result, her appeals were denied on or about May 29, 2020, and August 24, 2020.

68. Defendants refused to retain Dr. Marasi in her tenure track teaching position and terminated her employment and her participation in educational programs and activities with TTU because of sex, in violation of Title IX and Title VII; because of an actual or perceived impairment, in violation of the RA and the ADA; because Dr. Marasi opposed, reported, and participated in investigations of sex discrimination, sexual harassment, and retaliation, in violation of Title IX and Title VII; and/or because Dr. Marasi repeatedly requested reasonable accommodation from TTU and Dr. Timmerman from January through mid-March 2020 and opposed disability discrimination, in violation of the RA and the ADA.

69. As described above, Defendants discriminated against Dr. Marasi in the terms, conditions, and privileges of employment and in educational programs and activities because of sex, subjected her to a sexually hostile work environment that altered the conditions of her employment and her participation in educational programs and activities, and were deliberately indifferent to her complaints and reports about the same, in violation of Title IX and Title VII.

70. As described above, Defendants retaliated against Dr. Marasi for opposing and reporting sex-based discriminatory conduct and/or for participating in investigations of her sex discrimination and harassment complaints, in violation of Title IX and Title VII.

71. As described above, Defendants discriminated against Dr. Marasi in the terms, conditions, and privileges of employment because of an actual or perceived impairment and failed to reasonably accommodate her disability, in violation of the RA and the ADA.

72. As described above, Defendants retaliated against Dr. Marasi for requesting reasonable accommodation and for opposing disability discrimination, in violation of the RA and the ADA.

73. Defendants' conduct as described in this complaint was willful, deliberate, intentional, malicious, and/or recklessly indifferent to Dr. Marasi's federally protected rights.

74. As a result of Defendants' discriminatory and retaliatory conduct, Dr. Marasi has lost income and other privileges and benefits of employment and been excluded from participation in, denied the benefits of, and subjected to discrimination in educational programs and activities; suffered embarrassment, humiliation, severe emotional distress and anxiety, inconvenience, and loss of enjoyment of life; and incurred attorney's fees, costs, and litigation expenses.

75. Drs. Timmerman, Wells, and Oldham are liable in their official capacities for prospective injunctive and equitable relief, including but not limited to reinstatement, attorney's fees, and costs pursuant to *Ex parte Young*, 209 U.S. 123 (1908), and its progeny, to enjoin the ongoing violations of Dr. Marasi's rights and for the willful, deliberate, malicious, and/or recklessly indifferent discriminatory and retaliatory conduct described in this First Amended

15
Case 2:21-cv-00011   Document 14   Filed 04/29/21   Page 15 of 17 PageID #: 73

Complaint. These defendants have the authority or power to retain or reinstate Dr. Marasi to the same or an equivalent position at TTU and/or to recommend that she be retained or reinstated.

## RELIEF REQUESTED

WHEREFORE, Dr. Marasi respectfully requests:

1. That the Court declare that Defendants violated Title IX, Title VII, the RA, and the ADA and permanently enjoin them from violating her rights or grant her other equivalent equitable relief, and order them to reinstate her to an equivalent job position at TTU with the same or greater pay and benefits, including but not limited to the educational programs and activities in which she participated at TTU;

2. A jury trial and entry of judgment in her favor;

3. Back pay and damages for lost benefits;

4. Compensatory damages for embarrassment, humiliation, severe emotional distress and anxiety, inconvenience, and loss of enjoyment of life;

5. Reinstatement with restoration of all benefits and seniority or, alternatively, front pay and damages for lost benefits;

6. Punitive damages;

7. Attorneys' fees, costs, and litigation expenses;

8. Prejudgment interest and, if applicable, post-judgment interest; and

9. Such other and further injunctive, declaratory, equitable, and legal relief to which she may be entitled.

Respectfully submitted,

s/Douglas B. Janney III
Douglas B. Janney III (BPR No. 19112)
Law Office of Douglas B. Janney III
2021 Richard Jones Road, Suite 310A
Nashville, Tennessee 37215
(615) 742-5900
doug@janneylaw.com

*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that I electronically filed and served this First Amended Complaint using the Court's CM/ECF system upon Rachel A. Newton, Assistant Attorney General, UBS Tower, 315 Deaderick Street, P.O. Box 20207, Nashville, Tennessee 37202-0207 on April 29, 2021.

s/Douglas B. Janney III
Douglas B. Janney III